*New-Haven,*
July, 1842.

BUTLER and others *against* ELLIOTT and others:

### IN ERROR.

*A*, being indebted or liable to *B* on sundry drafts or notes indorsed by *C*, mortgaged, as security therefor, first to *B*, and afterwards to *C*, certain articles of personal property, with power to dispose of them, and to apply the net avails thereof to the payment of such drafts and notes. *A* afterwards, on the same day, mortgaged the same property to *D*, to secure a debt due from *A* to him. The next day, *C* made an arrangement with *R*, the acceptor of said drafts, then in doubtful credit, in pursuance of which, *C* received from *R* sundry other articles, at the prices stated in the invoice, in satisfaction of the acceptances of *R* to that amount; but it was also a part of that arrangement, as subsequently explained and modified, that *C* was to dispose of this property, at his best discretion, and apply the avails in payment of said drafts and notes. Under this arrangement, *C* sold the whole of said property, and applied the avails accordingly; all that was done by *C* in this matter, being done in good faith, in the exercise of sound judgment, and with the expectation of promoting the interests of all concerned. On a bill in chancery, brought by *D* against *C*, for the balance claimed to be in his hands, it was held, 1. *that the arrangement was in the nature of a compromise, by means of which, C, as endorser, endeavoured to get what he could of the acceptor;* 2. *that it was not necessary that D should be a party to such arrangement,* as the property, which was the subject of it, was not embraced in his mortgage; 3. *that it did not, of itself, operate as payment of R's acceptances, so as to discharge the incumbrances thereon;* 4. that *C* was chargeable, in relation to this property, only for the net avails thereof, and not at the invoice price; 5. that such avails, with the other securities in *C's* hands, being not more than sufficient to remove the prior incumbrances upon the property mortgaged to *D*, he had no claim upon *C*; and consequently, the bill must be dismissed, but without costs.

A court of chancery, in marshalling securities, for the purpose of protecting the interests of a subsequent mortgagee, will take care that no injustice be done to him who has the prior security.

Where an arrangement regarding the disposition of mortgaged property, reduced to writing and signed by the parties, was the subject of inquiry, before a committee in chancery, and the defendant introduced the parol testimony of a witness as to the intention of the parties in such arrangement; which testimony was stated in the report of the committee; and the court accepted the report, without rejecting such testimony, and thereupon dismissed the bill; on a writ of error, brought by the plaintiff, it was held, that whether such testimony was admissible or not, yet, as it could have no effect upon the decree, which, without it, must have been the same, the proceeding was not erroneous.

Where a defendant in a suit in chancery, against whom no decree was sought, and none could properly be passed, was offered, by his co-defendant, as a witness, after he had executed a release of all claim for costs; and he thereupon gave material evidence; it was held, that he was not incompetent, either by reason of his character as a party on the record, or as being interested in the event of the suit.

THIS was a bill in chancery for an account, discovery and payment, or surrender to the plaintiffs, of the balance in the hands of the defendants. The defendants, *Elliott & Doolittle,* made answer thereto ; and thereupon a committee was appointed to ascertain and report the facts. From these sources, the following statement is derived.

On the 11th of *April,* 1837, *Jarvis P. Bunce* and *Daniel P. Bunce,* partners, under the firm of *J. P. Bunce & Co.,* extensively engaged in the business of manufacturing carriages at *New-Haven,* and vending them in various parts of the *United States,* were indebted, or liable, to the *New-Haven County Bank,* in a large amount, to secure which, they executed to that institution a mortgage bill of sale of all their personal property, of every description, in and about their carriage factory, specified in a schedule annexed, invoiced at 25,188 dollars, 98 cents. The condition of this instrument, after counting upon the liability of the assignors to the bank on sundry drafts and notes by them drawn and made, particularly described, to the amount of 27,856 dollars, 75 cents, mostly indorsed by *Elliott & Doolittle,* provided, that if each of these drafts and notes should be paid according to its tenor, the conveyance should be void. Then followed this provision : " And in order that said security may be made available, in the best manner, for the interest of all parties concerned, it is hereby agreed, that the said bank shall have full power, at their best discretion, to sell and dispose of all and singular the several articles of personal property hereby conveyed, and shall also have power to finish the unfinished work on hand, and to work up the materials hereby conveyed, in the best and most prudent manner, and sell and dispose of said work when finished, and apply the net avails thereof, after deducting all expense attending the finishing, working up, and selling said property, and all other expenses which said bank may incur in managing and disposing of said property, to the payment and discharge of said several notes and drafts."

Afterwards, on the same day, *J. P. Bunce & Co.* executed another mortgage bill of sale of the same property to *Elliott & Doolittle,* subject to said security to the bank, to secure them for all their endorsements of the paper described in said conveyance to the bank, and of two other notes, amounting

to 1121 dollars, 76 cents, described in this instrument. After-
wards, on the same day, *J. P. Bunce & Co.* executed another
mortgage bill of sale of the same property, reference being
had to the first mortgage for a description thereof, to the
plaintiffs, *David W. Butler* and *Andrew Miller*, and *Ed-
mund B. Barnum*, to secure certain debts and liabilities in
their favour respectively, amounting to 2900 dollars, subject
to the claim of said bank and said mortgage to *Elliott & Doo-
little*. These bills of sale became valid and operative instru-
ments in the order above mentioned. On the same 11th of
*April*, 1837, *Jarvis P. Bunce* mortgaged to the *New-Haven
County Bank* a piece of land in *New-Haven*, together with
all the interest of the mortgagor in the co-partnership
property of *J. P. Bunce & Co.*, in and upon the premises,
consisting of finished and unfinished carriage-work, and ma-
terials for carrying on the business of carriage-making, and
also all the buildings upon said land, to secure the bank for
six drafts drawn by *J. P. Bunce & Co.*, on *Read & Williams*
of *New-York*, and discounted, by the bank, for the benefit of
the drawers, amounting to 7780 dollars.

At the time of the execution of these instruments, *William
H. Elliott* was president, and one of the directors, of the
*New-Haven County Bank*, and was also a partner of the firm
of *Elliott & Doolittle ;* and *Henry Hotchkiss* was one of the
directors of said bank. Immediately afterwards, *Elliott*
requested *Hotchkiss* to go to the city of *New-York* to enquire
into the situation of *Read & Williams*, a firm which had had
large dealings with *J. P. Bunce & Co.*, and were the acceptors
of a large proportion of the drafts mentioned in the mortgage to
the bank, and were believed to be about suspending business.
*Hotchkiss* accordingly went to *New-York ;* and *J. P. Bunce*
also went thither, at the same time. After their arrival in
*New-York*, they had interviews with *Read & Williams ;* and
in the result, the following instruments were executed.

1. " Messrs. *Elliott & Doolittle*, bought of *Read & Wil-
liams*, 1 buggy wagon, leather top, $155. [Other carriages,
harnesses and trimmings, with a sum affixed to each, amount-
ing, in the whole, to $16,095.25.] *Read & Williams.*"
" The foregoing property is taken, by *Elliott & Doolittle*, of
*New-Haven*, at the prices above stated, deducting therefrom
four months interest at 6 *per cent.*, in satisfaction of the

acceptances of *Read & Williams* of *New-York*, to that amount, of the drafts of *J. P. Bunce & Co.*, indorsed by said *Elliott & Doolittle*, and now held by the *New-Haven County Bank*, which acceptances were given for property received of *J. P. Bunce & Co.*, a part of which is included in the above bill. *New-York, April* 12th, 1837.

*Read & Williams.*

*Henry Hotchkiss*, agent of

*Elliott & Doolittle* and the *New-Haven County Bank*."
" The property mentioned in the foregoing invoice is this day left in my charge, by *Elliott & Doolittle*, for sale on their account. *New-York, April* 12th, 1837. *J. W. Allen*."

2. **A** similar bill of sale from *Read & Williams* to *Elliott & Doolittle*, dated *New-York, April* 12th, 1837, of carriages, &c., to the amount of 3670 dollars, 83 cents ; to which the following writings were annexed :

" The foregoing property, now in *New-Orleans*, in the hands of *Thomas Mason*, is taken by *Elliott & Doolittle* of *New-Haven*, at the prices above stated, on account of acceptances by *Read & Williams* of drafts of *J. P. Bunce & Co.*, some of which are endorsed by *Elliott & Doolittle*, others by *Coley & Smith*, and one by *Smith & Sherman*, now held by the *New-Haven County Bank*, in behalf of themselves and the other endorsers. The bank is to deliver to *Read & Williams* all their acceptances of *J. P. Bunce & Co.'s* paper now held by them : if *Elliott & Doolittle* shall so elect, they shall be at liberty, within flfteen days, to take satisfactory paper from *Read & Williams*, to the amount of this invoice, and re-deliver said property to them. If any of said invoice shall have been sold since last account of sales, *Elliott & Doolittle* shall receive from *Read & Williams* other property of like kind and value, or shall receive the proceeds of such as is sold, at their election. If *Coley & Smith*, or *Smith & Sherman*, decline this arrangement, the property above specified is to be returned to *Read & Williams*, to the amount of the paper so endorsed by either of them ; and if both decline, enough of the other invoice of this date is to be added to the above, and to be returned, to make up the whole amount on which *Coley & Smith* and *Smith & Sherman* are endorsers. *April* 12th, 1837. *Read & Williams*."

" The undersigned, *Coley & Smith*, and *Smith & Sherman*,

*New-Haven,*
July, 1842.

Butler
*v.*
Elliott.

for whose benefit the annexed sale and arrangement has been made between *J. P. Bunce & Co., Read & Williams,* and *Elliott & Doolittle,* for the purpose of securing ourselves respectively from all loss, cost and damage, which may arise to our several firms, by reason of our several endorsements of *J. P. Bunce & Co.'s* drafts on *Read & Williams,* endorsed by said *J. P. Bunce & Co.,* and ourselves, to the *New-Haven County Bank,* do accept of the said arrangement, and make our election to receive said property, and not to receive the notes or paper therein mentioned ; and we do severally request the said *Elliott & Doolittle* to take possession of said property, and manage, sell, or otherwise dispose of the same, at their best discretion, and apply the net avails thereof to the payment of our said respective endorsements, in proportion to the amount thereof, and we will save the said *Elliott & Doolittle* harmless from all loss or damage in the premises. After said avails of said property shall be sold and applied as aforesaid, we reserve to ourselves the right to look to said *Bunce & Co.* for any balance that may remain due for our said endorsements ; and we hereby severally guaranty to the *New-Haven County Bank* the payment of all acceptances made by *Read & Williams* of the drafts of *J. P. Bunce & Co.,* and endorsed by us respectively, to said bank, without demand on said *Read & Williams,* by said bank, or notice to us of the dishonour of said acceptances. And we severally reserve to ourselves the right to share proportionally in the benefit of any other securities which may have been given for the paper on which we are endorsers to said bank.

*New-Haven, April* 18th, 1837.     *Coley & Smith.*
    *Smith & Sherman.*"

" We assent to the above arrangement, in all particulars.
    *J. P. Bunce & Co.*"

3. A receipt given by *Hotchkiss* to *Read & Williams.*

" Received, *New-York, April* 12th, 1837, of Messrs. *Read & Williams,* two invoices of carriages, harnesses, &c., amounting to 19,518 dollars, 69 cents. In consideration of which, the *New-Haven County Bank* are to return to *Read & Williams* all their acceptances of the drafts of *J. P. Bunce & Co.,* now held by them ; the same being taken in discharge of all liabilities thereon, on the part of said *Read &*

*Williams ;* and to this I bind myself personally, though acting herein as agent.                    · *Henry Hotchkiss*, agent for

*Elliott & Doolittle* and others."

" The return of the drafts endorsed by *Coley & Smith*, and *Smith & Sherman*, is subject to the condition expressed upon one of the invoices of property this day received.

*H. H.*, agent for *E. & D.* and others."

4. An indorsement on the back of the above.

" For value received, we hereby severally promise to indemnify and save harmless the within named *Henry Hotchkiss*, from all loss, cost or damage, that has arisen, or may arise, to him, by reason of any liabilities which he has assumed, by executing the original agreement, of which the within is a true copy.

*Sept.* 19th, 1837.                    *Elliott & Doolittle.*

*Smith & Sherman.*

*Coley & Smith.*"

This indemnity was executed pursuant to an agreement made by the signers, soon after the 12th of *April,* 1837.

5. " The settlement this day made between *Read & Williams*, of *New-York*, on the one part, and *Henry Hotchkiss*, as agent for the *New-Haven County Bank* and others, of the other part, is made at our request, and with the understanding, on our part, that we are to be responsible to the said bank and others, on the paper held by said bank against us for the balance which may be due thereon, after applying the avails of the property which *Read & Williams* have this day transferred to *Elliott & Doolittle*, on said account ; and all other securities now held for such indebtedness are not to be impaired, by this arrangement.

*New-York, April* 12th, 1837.          *J. P. Bunce & Co.*"

6. A lease from *Wilmot Williams* to *Elliott & Doolittle* of the first story and cellar of a building in *Canal* street, in *New-York*, used as a carriage repository, from *April* 12th, 1837, to *April* 1st, 1838.

7. An agreement between *Elliott & Doolittle,* and *Jonathan W. Allen,* for the services of the latter, as clerk or agent, to take charge of the stock of carriages, and other property connected therewith in said carriage repository, for one year, and to sell said property, as he should have opportunity during the year.

New-Haven,
July, 1842.

Butler
v.
Elliott.

When *Hotchkiss* went to *New-York*, on the 11th of *April*, he had no particular information as to whom he was to act for, or what he was to do; and he felt much uncertainty of what party or parties he should describe himself as the agent; and in that uncertainty, he executed several instruments in different forms; but all was done by him in good faith, and in the exercise of sound judgment, and with the expectation of promoting the interests of the parties concerned. When he executed those instruments, he had no authority from the *New-Haven County Bank* to bind it thereby; and it has never ratified them. But on his return to *New-Haven* from *New-York*, he made report to *Elliott & Doolittle* of what he had done, and they ratified his acts.

On the 20th of *April*, 1837, *J. P. Bunce & Co.* executed the following instrument:

"Whereas *Elliott & Doolittle* have taken from *Read & Williams* of *New-York*, an invoice of carriages and other property, to the amount of 16,095 dollars, 25 cents, for which the said *Elliott & Doolittle* have agreed with said *Read & Williams* to assume their acceptances of the drafts of *J. P. Bunce & Co.*, of *New-Haven*, now holden by the *New-Haven County Bank*, for that amount; which invoice is dated *New-York, April* 12th, 1837, to which invoice reference is hereby made:

"Now, it is mutually agreed between the said *Elliott & Doolittle* and the said *J. P. Bunce & Co.*, that the said *Elliott & Doolittle* are to hold said property as security for their said undertaking and engagement to said *Read & Williams*, and as security for their liabilities on said drafts to said *New-Haven County Bank*, and to indemnify them, the said *Elliott & Doolittle*, from all loss, cost and damage, that they may suffer, by means of their said engagement to said *Read & Williams* and said liabilities; and that said *Elliott & Doolittle* are to proceed to sell and dispose of said property, in the manner agreed upon between them and *J. W. Allen*, of *New-York;* and that said *Elliott & Doolittle* are to apply the net avails of said property, after deducting all expenses of sale, insurance, &c., in discharge of such indebtedness as may arise from their said engagement and liabilities, as aforesaid; and that if said engagement to said *Read & Williams*, and said liabilities to said bank, shall be in any way

cancelled, so as to discharge said *Elliott & Doolittle* therefrom, then said *Elliott & Doolittle* shall be at liberty to return said property to said *J. P. Bunce & Co.*, or their order, at the prices in the invoice; they first deducting thereout so much as shall be necessary to indemnify themselves for all disbursements, expenses, payments and labour, bestowed by them upon said property, and in the sale thereof.

*J. P. Bunce & Co.*"

At the same time, *Elliott & Doolittle* and *J. P. Bunce & Co.* executed the following instrument:

"For value received, we, the undersigned, do hereby severally guaranty to the *New-Haven County Bank*, all the drafts which said bank holds, drawn by *J. P. Bunce & Co.*, of *New-Haven*, on *Read & Williams* of *New-York*, and endorsed by us, or either of us, to said bank; and we agree to be severally holden on said drafts, which we have so as aforesaid severally drawn and endorsed, without demand on *Read & Williams*, to accept or pay said drafts, and without notice to us, or either of us, of the dishonour of said drafts by said *Read & Williams*; and that this guaranty shall extend to all drafts past due and unpaid, as well as to such as come due hereafter.

*Elliott & Doolittle,*
*J. P. Bunce & Co.*"

Soon after the execution of these instruments, the *New-Haven County Bank*, by reason thereof, withdrew from the *City Bank of New-York* all the acceptances of *Read & Williams* not then due, which had been sent to that bank for collection; and the drafts so withdrawn were not protested, when they fell due. The drafts which had fallen due before that time, had been regularly protested.

*David W. Butler* and *Edmund Read*, two of the plaintiffs, had knowledge, soon after the 12th of *April*, 1837, that an arrangement had been made with *Read & Williams*, by which they had turned out a large amount of personal property in *New-York* and *New-Orleans*, on their indebtedness in their business with *J. P. Bunce & Co.*; but it did not appear, that either of them had knowledge of the particulars or terms of the arrangement, or that either of the plaintiffs was ever consulted on the subject. Neither of the plaintiffs had any knowledge of the execution of the three mortgage bills of

New-Haven,
July, 1842.

Butler
v.
Elliott.

sale, of the 11th of *April*, when *Hotchkiss* and *J. P. Bunce* went to *New-York*.

At the time of the arrangement of the 12th of *April*, the *New-Haven County Bank* held several promissory notes as collateral security for the indebtedness of *Read & Williams* to that bank ; a list of which notes, with the following writing annexed thereto, dated *April* 12th, 1837, was signed by *Read & Williams*, on that day, and at the same time with the other instruments of that date : " The foregoing collaterals are to be held by the *New-Haven County Bank*, until the property in *New-Orleans*, mentioned in the two invoices of this date, accompanied by orders on *Thomas Mason*, comes into the possession of the persons to whom said invoices are given ; and also as security to *J. P. Bunce & Co.*, for the adjustment of their account with *Read & Williams.*      *Read & Williams.*"

On the 19th of *September*, 1837, *J. P. Bunce & Co.* and *Elliott & Doolittle* respectively, executed the following writings on the back of said list : " We hereby request the *New-Haven County Bank* to return to *Read & Williams* the within described collateral notes, &c., they having settled their account with us to our satisfaction.

*J. P. Bunce & Co.*"

" The property in one of the invoices mentioned within having been received according to the within condition, amounting to 3,670 dollars, 83 cents, and the property in the other invoice mentioned within, not having been accepted by those for whose benefit it was intended, and no claim being made for the property in the latter invoice, we do hereby request the said bank to return said collaterals to said *Read & Williams.*                   *Elliott & Doolittle.*"

Soon after the 19th of *September*, 1837, the *New-Haven County Bank*, by reason of the two last-mentioned writings, returned said collaterals to *Read & Williams*, which were of little value.

Immediately after the execution of the three mortgage bills of sale of the 11th of *April*, 1837, *Elliott & Doolittle* took possesssion of all the property included in such bills of sale, with the knowledge and assent of the *New-Haven County Bank.* They finished most of the unfinished work, and worked up much of the stock, and disposed of the whole of the property, either in a finished or unfinished condition.

They laid out, on account of said property, (principal and interest) 9147 dollars, 47 cents, including 500 dollars as a compensation for their services, of which the committee allowed only 250 dollars ; and they received for said property, (principal and interest) 13,837 dollars, 93 cents.   The value of the personal property mortgaged by the three bills of sale of the 11th of *April*, was, when mortgaged, about the sum of the net avails of such property realized by *Elliott & Doolittle.*

Immediately after the execution of the instruments of the 12th of *April*, *Elliott & Doolittle* took possession of all the property thereby transferred to them from *Read & Williams*, and disposed of the whole thereof.   For this property they received (principal and interest) 14,915 dollars, 69 cents ; and they laid out, on account of it, (principal and interest) 4,353 dollars, 31 cents.   The value of this property, so turned out by *Read & Williams*, was, when turned out, about the sum of the net avails thereof realized by *Elliott & Doolittle.*

All that was done by *Elliott & Doolittle* with, or in relation to, both descriptions of property, was done by them in good faith, and in the exercise of sound judgment, and with the expectation of promoting the interests of the parties concerned.

*Read & Williams*, on the 12th of *April*, 1837, were in doubtful credit, and have ever since so remained ; and, in all probability, a larger amount could not, in any way, have been obtained from them, on account of their indebtedness, than said net avails of the property so turned out by them ; which was nearly all their visible property.   Immediately after turning it out, they discontinued their regular business, and suspended payment.

The firm of *J. P. Bunce & Co.*, and the members of that firm, are, and ever since the 11th of *April*, 1837, have been, wholly insolvent.

*Elliott & Doolittle* have paid and taken up, and now hold, the several notes and drafts secured by the mortgages of the 11th of *April*, and by the property taken of *Read & Williams* on the 12th; all of which notes and drafts, except three, were indorsed by them, at the request, and for the benefit and accommodation of *J. P. Bunce & Co.*   Five of the acceptances of *Read & Williams*, which were indorsed by *Elliott & Doolittle*, and not taken up by them, amounting

to 6150 dollars, are owned and held by the *New-Haven County Bank,* and remain therein unpaid. But *Elliott & Doolittle,* on the 17th of *January,* 1839, deposited in said bank, to the credit of *Henry Hotchkiss,* president thereof, the sum of 6150 dollars, to be applied to the payment of said five drafts, whenever they (*E. & D.*) should demand such drafts of the bank ; the sum so deposited being equal to the amount then due to the bank on such drafts.

The claims in favour of the plaintiffs, against *J. P. Bunce & Co.,* mentioned in the mortgage bill of sale to them of the 11th of *April,* have never been paid, but remain due in full.

The real estate of *Jarvis P. Bunce,* mortgaged to the *New-Haven County Bank,* on the 11th of *April,* 1837, is of the value of 5500 dollars ; but it is subject to two mortgages prior to the mortgage to the bank, amounting to 2,737 dollars, 81 cents, and interest.

With regard to the property conveyed to *Elliott & Doolittle,* by *Read & Williams, Elliott & Doolittle,* in their answer, stated, that " an agreement was made with said *Read & Williams,* by *Henry Hotchkiss,* acting as agent for said bank, and for *Elliott & Doolittle,* by virtue of which said property, then in the carriage repository of said *Read & Williams,* in the city of *New-York,* was taken, by *Elliott & Doolittle,* at the prices annexed thereto in said bill of sale, deducting therefrom 4 months interest at 6 *per cent.,* in satisfaction only of the liabilities of said *Read & Williams* on said drafts on them, then held by said bank, and endorsed by *Elliott & Doolittle :* and said property then in *New-Orleans,* was taken by *Elliott & Doolittle,* at the prices annexed thereto in said bill of sale thereof, on account of said acceptances of said *Read & Williams.*" In a subsequent part of their answer, *Elliott & Doolittle* stated, that " said agreement with said *Read & Williams* respecting said property in the city of *New-York,* and said property in *New-Orleans,* was made with the knowledge, and assent and request of said *J. P. Bunce & Co.,* and with the express understanding and agreement, on the part of said *J. P. Bunce & Co.,* with said bank and with said *Elliott & Doolittle,* that said *J. P. Bunce & Co.* were to be responsible to said bank, and to said *Elliott & Doolittle* and others, on said paper, held by said bank, against said *J. P. Bunce & Co.,* as drawers, for the balance which might re-

*New-Haven,*
*July, 1842.*

Butler
*v.*
Elliott.

main due thereon, after applying the net avails of the sale of all said property which said *Read & Williams* transferred to said *Elliott & Doolittle ;* and that all other securities then held by said bank, and by said *Elliott & Doolittle* for such indebtedness to said bank, were not to be impaired, by said arrangement with said *Read & Williams."*

On the hearing before the committee, *Henry Hotchkiss* was introduced, by the plaintiffs, as a witness ; and on his cross-examination, he was asked, by *Elliott & Doolittle,* whether he intended to agree, or did in fact agree, by any thing which he did in *New-York,* on the 12th of *April,* to render *Elliott & Doolittle* responsible for any greater amount than the actual value or net receipts of the personal property then turned out by *Read & Williams ;* and whether, on his return from *New-York,* he reported to *Elliott & Doolittle,* that such was the arrangement made by him in *New-York,* in their behalf ?  The plaintiffs objected to this question, on the ground that the arrangement made in *New-York* was in writing, and the evidence offered, from its parol character, was, therefore, inadmissible.  It was then agreed between the parties, that the witness might answer the question, subject to the opinion of the court on the admissibility of such answer.  The witness thereupon answered, that he did not intend to agree, and did not suppose he had agreed, that *Elliott & Doolittle* were to be responsible for any greater amount than the actual value or net receipts of said personal property so turned out ; and that he reported to *Elliott & Doolittle,* that such was the arrangement, on his return from *New-York,* and at all other times.  If the court should be of opinion, that said answer, under the circumstances, was admissible, the committee found that it was true.

In the further progress of the hearing before the committee, *Elliott & Doolittle* offered *Jarvis P. Bunce,* one of the defendants, as a witness in their behalf ; and as a preliminary, they read an instrument, dated *October* 4th, 1841, executed by *Jarvis P. Bunce* and *Daniel P. Bunce,* stating, that they had no interest in the controversy between the parties to this suit, and disclaiming any right to costs, in any event, in their favour against the plaintiffs.  The plaintiffs objected to the competency of the witness, on the ground that he was still interested in the event of the suit.  It was then agreed

between the parties, that he might testify, on condition that the question of his competency should be decided by the court ; and he thereupon gave in his testimony, which was in relation to important facts, and had influence with the committee as material evidence in the cause.

The superior court accepted the report of the committee, and thereupon dismissed the plaintiffs' bill, but without costs against them. The plaintiffs then, by motion in error, brought the record before this court for revision.

*R. I. Ingersoll* and *Mix*, for the plaintiffs, contended, 1. That the testimony of *Hotchkiss* was inadmissible. This was parol evidence, introduced to vary a clear written agreement. *Pitkin* v. *Brainerd* & al. 5 *Conn. Rep.* 451. 457.

2. That *J. P. Bunce* was an incompetent witness, being interested in the event of the suit. In the first place, costs were not released *against* him ; and being discretionary, they might afterwards be taxed. *Cowles* & al. v. *Whitman* & al. 10 *Conn. Rep.* 121. Secondly, on this bill the court may properly decree that both *Bunce & Co.* and *Elliott & Doolittle* shall pay the plaintiffs. In this view, *Bunce* stands like a defendant in any case, offered as a witness, against whom the court may adjudge the debt.

3. That the superior court should have rejected so much of the report as is contrary to the admission of *Elliott & Doolittle* in their answer, that the property received by them of *Read & Williams*, was taken at the prices annexed thereto in the bill of sale. The defendants are estopped, by such admission. *Rosc. Ev.* 33. *Bul. N. P.* 298.

4. That the plaintiffs, upon the facts found, are entitled to a decree for their whole debts. The *Read & Williams* drafts are *paid* paper—so far as the plaintiffs are concerned, on this record, if not for every purpose. *Elliott & Doolittle* could not bring a bill in equity, to foreclose the *New-Haven* property, predicated on the *Read & Williams* paper, on the mortgage of the 11th of *April*, 1837, against either *Read & Williams*, or these plaintiffs, or any one ; for they would have to produce the drafts for a decree. *Beers* v. *Hawley*, 3 *Conn. Rep.* 110. *Read & Williams* could, on a bill in equity, call out that paper from *Elliott & Doolittle*, as *paid* and *satisfied* paper, to prevent any improper or vexatious use of it.

2 *Sw. Dig*. 157.   2 *P. Wms*. 68. n.   13 *Ves*. 585.   17 *Ves*. 112.   The subsequent arrangement between *Elliott & Doolittle* and *Bunce & Co*. and the bank, of the 12th and 20th of *April*, being in the nature of a mortgage between *Bunce & Co*. and *Elliott & Doolittle*, of a subsequent date, *Elliott & Doolittle* still holding possession of the paper, and leaving five drafts of 6150 dollars in the bank, does not affect the plaintiffs' prior right or lien of the 11th of *April*.  There was no *necessity* for *Elliott & Doolittle* to keep possession of the paper, as to the plaintiffs, as to *Read & Williams*, or any body.   The subsequent arrangement was a *new* contract, by which *Elliott & Doolittle* assumed a new liability, and the bank accepted it, and *Bunce & Co*. assented to it.   If the invoices of the property had appreciated, *Elliott & Doolittle* would have had the difference ; and as between *Elliott & Doolittle* and *Bunce & Co*., they (*E. & D*.) would have the benefit, at all events.

It matters not that *Elliott & Doolittle*, in the proceedings of the 12th of *April*, in *New-York*, went for *further security*.  They did not get it ; and could not get it, but by opening the *New-Haven* personal property to the plaintiffs' mortgage, after the six notes of *Elliott & Doolittle*, and relieving it of all *Read & Williams*' paper ; the plaintiffs consenting to no charge of any deficiency.

The general equity is in favour of the plaintiffs.   Why should *Elliott & Doolittle* be paid in full, and the plaintiffs nothing ?

5. That *Elliott & Doolittle* are liable, because they discharged, without right, the responsibility of *Read & Williams*, and gave up the collaterals.   How much this would have effected, is not known ; but the holder of a security cannot give time or accept a composition, without discharging the surety.   2 *Sw. Dig*. 151, 2.

6. That *Elliott & Doolittle* are liable, because they had a lien on several funds and securities, and the plaintiffs on but one ; and they are to be confined to the one which the junior creditors cannot reach.   *Evertson* v. *Booth* & al. 19 *Johns. Rep*. 486.

*Baldwin* and *White*, for the defendants, contended, 1. That the plaintiffs, in consequence of the arrangement made with

*Read & Williams*, acquired no right to compel *Elliott & Doolittle*, who are prior mortgagees of the property in *New-Haven*, to relieve that property to a greater amount, or to account to the plaintiffs for any more, than the actual value of the property received of *Read & Williams*.

In the first place, the agreement between *Read & Williams* was made, not with the *New-Haven County Bank*, the holders of the paper, but with *Elliott & Doolittle*, the indorsers. The bank never authorized the arrangement to be made ; nor ratified it or consented to it, after it was made.

Secondly, the arrangement with *Read & Williams* was to this effect : The indorsers of the drafts, in consideration of property delivered to them by *Read & Williams*, the acceptors, agree with *Read & Williams*, with the consent of the drawers, to assume the liabilities of the acceptors to the holders, to the amount of the prices affixed to this property, in the instruments of conveyance ; and also agree, that these acceptances shall be delivered up to *Read & Williams ;* and, at the same time, the drawers agree, that the endorsers may hold this property, as additional security for their liabilities as endorsers, being accountable for the net avails only ; and that this arrangement shall not prejudice the securities held by the endorsers for their claim on the drawers, and on the mortgage given by them. That this is the true construction is sufficiently evident from the papers executed on the 12th of *April.* It is more explicitly stated in the papers executed subsequently, which form a part of the arrangement. It is confirmed, also, by the testimony of *Henry Hotchkiss*, as reported by the committee.

The construction attempted to be given, by the plaintiffs, to this arrangement with *Read & Williams*, is unsupported. The claim that it amounts to a *payment* of these drafts by *Read & Williams* to the holders, is rebutted, by the fact that the holders were no parties to the arrangement, and by the course which was taken with these drafts after the arrangement was made. Nor is the claim that it amounts to a payment to the indorsers, to the amount of the value annexed to the property, sustained by the language of the papers. It involves, moreover, such a disregard of their own interests, on the part of the indorsers, as to make it impossible that they

Butler
v.
Elliott.

should have intended to make such an agreement, and is contrary to the representation made to them by *Hotchkiss.*

Thirdly, none of those equities arise here in favour of the plaintiffs, which sureties, or subsequent parties on negotiable paper, have, when the holder varies or releases the contract *of a preceding party*: for this arrangement was made with the acceptors, with the consent and at the request of the drawers. The plaintiffs not being parties to this paper, had no claim to be consulted in any negotiations for further security between the parties. The right of the indorsers to endeavour in good faith to better their security, was not at the mercy or caprice of the plaintiffs.

Fourthly, none of those equities arise in favour of the plaintiffs, which sometimes arise in favour of a junior creditor having one fund only, in consequence of the manner in which prior creditors having two funds may have treated the fund on which the junior creditor has no lien. For the defendants have relinquished nothing which was of any value to the plaintiffs. They have relieved the fund on which the plaintiffs had a lien, to a large amount, which would have been lost, had not this arrangement been made. They made the arrangement in good faith, and with the intention and expectation of promoting the interests of all the parties concerned. *Cheesebrough* & al. v. *Willard* & al. 1 *Johns. Ch. Rep.* 409. 415.

2. That the testimony of *Hotchkiss* was admissible to rebut the equity claimed by the plaintiffs, in contravention of the intention of the parties. 2 *Johns. Ch. Rep.* 598. 2 *Sto. Eq.* 746. *Abbe* v. *Goodwin*, 7 *Conn. Rep.* 377.

3. That *Jarvis P. Bunce*, one of the defendants, was properly admitted as a witness in behalf of the co-defendants, *Elliott & Doolittle;* he being a party *pro forma*, against whom no decree was sought by the bill, and having relinquished all claim for costs on the plaintiffs. 2 *Mad. Chan.* 415, 16. *Kirk* v. *Hodgson* & al. 2 *Johns. Ch. Rep.* 550. *Neilson* v. *McDonald* & al. 6 *Johns. Ch. Rep.* 201.

WAITE, J. 1. The principal question involved in this case, is, whether *Elliott & Doolittle* are chargeable for the property received of *Read & Williams*, at the invoice price, or only for the net avails arising from the sale of the property.

*New-Haven,*
July, 1842.

Butler
*v.*
Elliott.

It is apparent from the report of the committee, that if the latter rule is adopted, the plaintiffs have no claim upon them. For the net avails of all the property mortgaged to them, and received of *Read & Williams*, together with all the interest in the real estate conveyed by the mortgage deed to the bank, will not be more than sufficient to remove the prior incumbrances upon the property mortgaged to the plaintiffs. And they are not entitled to any portion of that property, until the debts for which it was previously mortgaged, are satisfied.

But it is claimed, that *Elliott & Doolittle* are chargeable with the property received of *Read & Williams, as purchasers,* at the invoice price. It is true, the property was received under an agreement that they should discharge to that amount the indebtedness of *Read & Williams* to the bank.

This, however, was a mere compromise between these parties ; *Elliott & Doolittle*, as endorsers, endeavouring to get what they could of the acceptors, who were primarily liable, and in failing circumstances.

When we look at the arrangement made, immediately afterwards, with *J. P. Bunce & Co.*, the drawers of these drafts, and *Coley & Smith* and *Smith & Sherman*, the other endorsers, we see the true character of the arrangement. *Elliott & Doolittle* are not treated as the purchasers of the property, but as the agents of the parties interested to take this property, and dispose of it at their best discretion, and apply the avails in payment of the debts due the bank. For any balance that may remain of these debts, the parties were to remain liable.

Under this arrangement, they sold the whole property, retaining no part of it to themselves.

But it is said, the plaintiffs were not a party to this arrangement, and consequently, are not bound by it. It is true, they were not a party ; and the reason is obvious,— their mortgage embraced no part of that property ; and consequently, the parties interested were under no obligation to make them a party in any negotiation respecting it.

How stand these plaintiffs in relation to the property received of *Read & Williams?* *J. P. Bunce & Co.* had drawn drafts to a large amount upon them, which had been accepted, and discounted at the bank. Upon the greater part of

these drafts, *Elliott & Doolittle* were endorsers. To secure these and other debts due the bank, *J. P. Bunce & Co.* executed to the bank a mortgage. They then execute another mortgage to *Elliott & Doolittle*, to indemnify them for the endorsement of these drafts and certain promissory notes. Afterwards, they execute another mortgage of the same property to the plaintiffs, to secure certain notes due to them.

Now, all the plaintiffs can require of the bank and *Elliott & Doolittle*, the prior mortgagees, is, to act fairly and reasonably in their efforts to collect what they can of *Read & Williams*, the party primarily liable upon the drafts, so as thereby to remove the prior liens upon the property mortgaged to the plaintiffs. But in their negotiations with *Read & Williams*, they are not bound to make the plaintiffs a party, or even to consult them in relation to the subject. It is not in the power of these plaintiffs to say to them, you shall not negotiate with *Read & Williams*, without our consent.

A court of chancery, in marshalling securities for the purpose of protecting the interests of a subsequent mortgagee, will take care that no injustice be done to him who has the prior security.

The committee, in this case, have found, that when the arrangement was made with *Read & Williams*, they were in doubtful credit ; and, in all probability, a larger amount could not, in any way, have been obtained from them, on account of their indebtedness to the bank, than the net avails of the property turned out to *Elliott & Doolittle ;* and all that was done by the latter, was done by them in good faith, in the exercise of sound judgment, and with the expectation of promoting the interests of the parties concerned. This is all that the plaintiffs can require of them.

It is further said, that the arrangement made with *Read & Williams* operated as *payment* of their acceptances, and consequently, the property mortgaged to the plaintiffs became discharged from the prior liens on account of these debts. But this is manifestly not so.

These acceptances were holden by the bank, which was no party to the arrangement. The directors probably considered the endorsers sufficiently responsible for the debts due to the bank, and therefore, took no part in the arrangement

*New-Haven,*
July, 1842.

Butler
*v.*
Elliott.

with the acceptors. That was made entirely by the other persons liable. Notwithstanding the arrangement, *Read & Williams* continued liable to the bank, and were never discharged from that liability until the drafts were paid by *Elliott & Doolittle.*

It is also insisted, that the report of the committee is contrary to the admission of *Elliott & Doolittle* in their answer. They do, indeed, say, that the property was received of *Read & Williams,* at the prices annexed thereto in the bill of sale. But they afterwards go on to explain the manner in which it was received. They say, that it was received with the knowledge and assent, and at the request, of *J. P. Bunce & Co.,* and that they were to be responsible only for the net avails.

2. It is further said, that the court erred in not rejecting from the report of the committee the answer given by *Hotchkiss* to the question put by *Elliott & Doolittle.* We consider it unnecessary to enquire whether that answer was admissible in evidence ; because it can have no effect upon the decree. If it were entirely stricken out of the report, the decree must remain as it is. And whether it was formally rejected in the decree of the superior court or not, is of no importance.

3. The testimony of *Bunce* stands upon different ground. It was received, and had influence with the committee, as material evidence in the case. The ground of the objection was, that he was interested in the event of the suit.

He was a party on the record. But that constitutes no valid objection, provided he was not interested, and was willing to testify. *Woodruff* & al. v. *Westcott,* 12 *Conn. Rep.* 134.    *Cowles* & al. v. *Whitman* & al. 10 *Conn. Rep.* 121.

Had he any interest ? The plaintiffs had prayed for no decree against him. The facts disclosed by the pleadings and the report of the committee, do not shew, that any decree could properly be made against him ; and he had waived all claim for costs.

It is, however, said, that he might be subjected to the payment of costs. It is difficult to see how that could, with propriety, be done, if no other decree could be made against him. At any rate, the facts in the case do not shew any such liability.

HARVARD LAW LIBRARY

We think, therefore, that there is no error in the proceedings of the court below; and that the decree must be affirmed.

In this opinion the other Judges concurred.

Decree affirmed.